IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE DAVIS, | ) | Case No. 5:24-cv-1447 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Stephanie Davis ("Davis"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Davis's application for DIB be affirmed.

## II.    Procedural History

Davis filed for DIB on February 16, 2022, alleging a disability onset date of March 1, 2020. (Tr. 239). The claims were denied initially and on reconsideration. (Tr. 118-29, 132-41). She then requested a hearing before an ALJ. (Tr. 158). Davis (represented by counsel) and a vocational expert ("VE") testified before the ALJ on June 8, 2023. (Tr. 75-117). On August 15,

2023, the ALJ issued a written decision finding Davis not disabled. (Tr. 7-31). The Appeals

Council denied her request for review on June 24, 2024, making the hearing decision the final

decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Davis timely filed

this action on August 24, 2024. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Davis was 45 years old on the alleged onset date, making her a younger individual

according to Agency regulations. (*See* Tr. 24). She has a limited education. (*See id.*). In the past,

she worked as a cleaner, housekeeper, and hand packager. (*Id.*).

### B.    Relevant Medical Evidence

On November 17, 2020, Peter Laszlo, M.D., wrote a letter indicating that Davis was a

patient under his care at high risk should she be exposed to COVID-19 and that she should not be

at work with active COVID-19 cases in the facility. (Tr. 1041). Dr. Laszlo provided the same

recommendation in a letter dated February 3, 2021. (Tr. 1042). On April 21, 2021, Dr. Laszlo

stated Davis "is currently under my medical care and has an autoimmune disease" with no

further recommendation contained within the letter. (Tr. 1043).

On November 2, 2021, Davis met with Inderprit Singh, M.D. complaining of possible

renal infection and pain after a fall in a parking lot. (Tr. 517-18). Dr. Singh assessed Davis with

Raynaud's phenomenon and low back pain; he increased gabapentin to 200 mg three times daily.

(Tr. 520).

On January 10, 2022, Davis followed up with orthopedist Jacob Hoffmann, M.D., for her

back pain and to follow up on an MRI of her lumbar spine. (Tr. 492). On examination, Davis had

normal gait without an assistive device, could toe and heel walk, and could perform tandem gait.

(Tr. 494). She had normal spinal range of motion without tenderness and 5/5 strength. (*Id.*). He reviewed the MRI of her lumbar spine which indicated mild L4-L5 lateral recess and central stenosis without significant nerve root impingement. (Tr. 495). Dr. Hoffmann placed a referral to pain management for L4-L5 injections and recommended she continue physical therapy, but did not recommend surgical intervention. (*Id.*).

On March 2, 2022, Davis underwent a lumbar epidural steroid injection at L4-L5. (Tr. 769). She tolerated the procedure well, and indicated her pain had improved, and she had very little tingling in her feet, better than when she had arrived. (*Id.*). However, at a physical therapy appointment on April 21, 2022, Davis reported that the lumbar injection did not work. (Tr. 817). As a result, she demonstrated difficulty in her physical therapy session and needed to modify to better tolerate aquatic therapy. (*Id.*).

On April 29, 2022, Davis attended an initial counseling evaluation with Denise Weisfelder, LISW. (Tr. 812-13). She described depression and anxiety symptoms, along with self-harm when frustrated. (Tr. 813). She denied previous suicide attempts, but Ms. Weisfelder noted risk factors to include impulsive or aggressive tendencies. (Tr. 814). On examination, Davis had an anxious mood and full affect, with intact cognition and good insight and judgment. (Tr. 816). Ms. Weisfelder diagnosed Davis with major depressive disorder, recurrent, moderate, and generalized anxiety disorder; she recommended following up with a therapist and scheduling with a psych M.D. (*Id.*).

On May 10, 2022, Davis met with Dr. Singh with complaints of renal and low back pain, and tightness in her left chest wall. (Tr. 806). She was positive for fatigue, had chest wall tenderness, low grade parotid swelling, and decreased lumbar range of motion. (Tr. 807). Dr. Singh recommended observation of the chest wall tenderness and obtaining an EKG. (Tr. 808).

He also noted December 2021 MRI results indicating a mild/moderate degree of degenerative central canal stenosis and bilateral foraminal stenosis at the L4-L5 level secondary to hypertrophy of the posterior elements in addition to a broad-based disc bulging greater towards the right side. (Tr. 809). Dr. Singh noted epidurals helped with pain and deferred to pain management for treatment. (*Id.*).

On May 23, 2022, Davis followed up with Dr. Hoffmann for her back pain. (Tr. 840). Dr. Hoffmann noted that she had attempted physical therapy, but it worsened her symptoms. (*Id.*). He reviewed the MRI of her lumbar spine which indicated L4-L5 stenosis. (*Id.*). Dr. Hoffmann placed a referral to pain management for L4-L5 injections and recommended she continue physical therapy but did not recommend surgical intervention. (*Id.*). Dr. Hoffmann also noted Davis had not been able to establish care with pain management but had an upcoming appointment scheduled the next month; she reported substantial improvement of back pain after interventional radiology. (*Id.*). On examination, Davis had normal gait without an assistive device, could toe and heel walk, and could perform tandem gait. (Tr. 842). She had normal spinal range of motion without tenderness and 5/5 strength. (Tr. 842). Dr. Hoffmann prescribed a Medrol dose pack and recommended non-surgical treatment including activity as tolerated. (Tr. 843).

On June 10, 2022, Davis attended a new patient consultation with Kermit Fox, M.D. for treatment of her low back pain. (Tr. 861). Dr. Fox noted that she had a lumbar strain in 2018 or 2019 which self-resolved, but that she had a fall in April 2022 which flared up her back pain. (*Id.*). Davis reported her pain as 8/10 since. (*Id.*). Davis reported taking Naproxen without relief, some opioids, although Vicodin caused GI upset, and muscle relaxants made her foggy. (Tr. 862). On examination, Davis had normal muscle tone and 5/5 strength, lumbar tenderness

bilaterally, decreased 75% spinal range of motion on flexion and extension with end range pain. (Tr. 865). Dr. Fox recommended epidural steroid injections bilaterally at L5-S1 and continuing Cymbalta 60 mg daily. (*Id.*). Depending on the response to the above course, Dr. Fox indicated potential evaluation for bilateral medial branch blocks at L4-L5, L5-S1. (*Id.*).

Dr. Fox performed a bilateral epidural steroid injection on July 11, 2022. (Tr. 932). Davis reported pain of 6/10 after the procedure and was discharged in good condition. (Tr. 937).

Davis followed up with Dr. Singh on August 16, 2022, complaining of pain in her back, left knee, and left wrist. (Tr. 917-18). She was using a brace on her left wrist. (Tr. 918). All examination findings were normal, aside from left wrist tenderness. (Tr. 918-19). An August 26, 2022 x-ray of her left wrist showed no fracture or dislocation, preserved joint spaces with no erosions, and unremarkable soft tissue. (Tr. 950-51).

On November 14, 2022, Davis followed up with Dr. Hoffmann for treatment of her low back pain, reporting worsening low back and bilateral leg pain, with two weeks of pain relief from the July epidural steroid injection. (Tr. 1115). Dr. Hoffman stated that Davis was clinically indicated and wished to consider lumbar decompression surgery at L4-L5. (Tr. 1118). Davis stated she would call Dr. Hoffman's office with a final decision. (Tr. 1119).

On January 10, 2023, Davis followed up with Dr. Singh complaining of pain in her left wrist, a weak grasp, with no improvement after using a splint, and of constant back pain 9/10. (Tr. 1001). All examination findings were normal, aside from spasms and decreased range of motion in the lumbar back. (Tr. 1002). Dr. Singh included comments of left wrist tenderness, ankle hypermobility, and pain at mid foot left. (*Id.*). Dr. Singh noted a cane was prescribed December 2022 by orthopedics. (Tr. 1005).

On March 13, 2023, Davis followed up with Dr. Hoffmann for surgical consent. (Tr. 1047). She reported that the pain in her legs had improved, with 90% low back pain; she was unsure if she wished to continue with surgical intervention. (Tr. 1047). Dr. Hoffmann reviewed a March 8, 2023 MRI of the lumbar spine, which reviewed mild spinal canal stenosis at L3-L4 and L4-L5, as well as advanced bilateral L4-L5 facet arthrosis with associated marrow edema, likely reactive/degenerative in etiology. (Tr. 1050). Dr. Hoffmann discussed with Davis at length the goals for surgery; he noted that since her radicular pain had improved, she may not see much improvement in pain with surgical intervention. (*Id.*). Davis elected not to proceed with surgical intervention. (*Id.*). Dr. Hoffmann recommended she follow up with pain management to discuss options for chronic low back pain control. (*Id.*).

Davis followed up with Dr. Fox on March 22, 2023, complaining of daily low back pain affecting her sleep and activities. (Tr. 1015). Dr. Fox recommended a second set of medial branch block injections bilaterally at L4-L5 and L5-S1, with follow up in three months. (Tr. 1022).

Davis attended a family medicine office visit on May 5, 2023, complaining of pain in her left foot, top to lateral aspect, after a fall. (Tr. 1140). Davis reported that turning aggravates the pain and rated her pain at 8/10; she was elevating, icing, and taking ibuprofen without relief. (*Id.*). Davis was ambulating in the office without difficulty on examination. (Tr 1142). Alexandra Rodriguez, PA-C referred Davis for an x-ray of her foot with follow up in orthopedics if fractured, otherwise continue supportive care at home. (Tr. 1142). X-rays from that day show no acute fracture. (Tr. 1138).

### C. Medical Opinion Evidence

On November 19, 2020, Christopher Ward, Ph.D., conducted a consultative psychological examination. (Tr. 413-18). Davis presented as depressed with flattened affect; on examination, she was alert, responsive, and oriented; her intellectual functioning appeared to fall within to slightly below normal limits based on testing. (Tr. 416). In Dr. Ward's assessment, Davis may have difficulty with understanding verbal instructions but did not have problems with short term memory; she appeared to have difficulty with attention and focus; she had some social limitations; she did not have intellectual limitations that would impact her ability to understand and respond to supervisory feedback; she may have problems managing pressure in work situations. (Tr. 417-18).

On June 19, 2021, Davis attended a consultative examination conducted by Jenna Borys, D.O. (Tr. 422-25). Davis indicated a chief complaint of left ankle pain, rated at a 10/10, starting in April 2021.[1] (Tr. 422). Davis reported trying ice, elevation, a brace, and NSAIDs without relief; she had not attempted physical therapy or injections. (*Id.*). She could stand and bear weight on the foot for about 30 minutes at a time. (*Id.*). She had an abnormal gait but did not use an assistive device. (Tr. 423). Fine motor skills including grasp, pinch, and writing were normal. (*Id.*). Aside from tenderness in the medial and anterior aspect of her left foot, Davis's musculoskeletal exam was within normal limits. (Tr. 424).

Dr. Borys did not have a diagnosis for the etiology of Davis's left ankle pain, but based on physical examination, Dr. Borys recommended sedentary duty until the etiology was further delineated. (Tr. 424). In her assessment, Dr. Borys recommended minimizing time standing to

---

[1] Elsewhere in the examination, Dr. Borys notes the left ankle pain started in September the year before. (*See* Tr. 424).

less than one hour per day with minimal periods of time ambulating; no climbing of ladders or operating heavy machinery; she also had no need to switch positions from sitting to standing frequently as this exacerbated her pain. (*Id.*).

On May 4, 2022, Davis underwent a physical capacity evaluation with Brett Balis, P.T. (Tr. 779-81). In Mr. Balis's assessment, Davis could perform within sedentary physical demands, and work part time up to 6 hours and 46 minutes per day, but that the sedentary occupational base was significantly eroded because of her inability to sit for approximately six hours of an eight-hour workday and sit for at least two hours at a time. (Tr. 780). She was able to lift and carry 8-10 pounds, she had occasional tolerance for bending, firm grasping, gross coordination, and walking; she could frequently reach overhead and forward, pinch and simple grasping, and fine coordination; she needed to avoid squatting and stair climbing. (Tr. 780).

On May 26, 2022, state agency reviewing physician Steve McKee, M.D., opined Davis could perform light work, with additional limitations including: lifting, carrying, and pulling 20 pounds occasionally and 10 pounds frequently; standing/walking for no more than four hours and sitting for six hours out of an eight-hour workday; frequent stooping and kneeling, occasional climbing of ramps or stairs, crouching, and crawling, and never climbing ladders, ropes, or scaffolds; and no exposure to workplace hazards including dangerous machinery and unprotected heights. (Tr. 124-25). At reconsideration on October 12, 2022, state agency reviewing physician Maria Congbalay, M.D., affirmed Dr. McKee's findings. (Tr. 137-38).

On June 30, 2022, Davis attended a mental status examination conducted by Andrea VanEstenberg, Ph.D. (Tr. 905-10). Davis reported that she receives medication management in the form of hydroxyzine from her primary care physician and she had a referral for a psychologist and CNP; she had previously attended one telehealth counseling session. (Tr. 906-

8

07). Davis reported symptoms of depression, as well as problems with memory and concentration. (Tr. 907).

In Dr. VanEstenberg's opinion, Davis did not have limitations in understanding, remembering, and carrying out simple, routine tasks; she was not limited in her ability to maintain attention and concentration, persistence, and pace, and in performing simple and multi-step tasks; she could respond appropriately to typical work pressures in a more isolated setting with simplistic and single-step highly repetitive tasks. (Tr. 909-10).

On August 9, 2022, state agency reviewing psychologist Ryan Mendoza, Ph.D., opined that Davis had mild limitations in her ability to understand, remember, or apply information and interact with others;  moderate limitations in her ability to concentrate, persist, or maintain pace and adapt or manage herself; but that she could perform simple, routine work tasks, adapt to job duties that are static in nature, sustain usual interactions with the public, coworkers, and supervisors, and understand and remember detailed and complex tasks. (Tr. 122-23, 126-27).  On October 4, 2022, state agency reviewing psychologist Katherine Fernandez, Psy.D., affirmed Dr. Mendoza's findings. (Tr. 138-40).

On January 18, 2023, Dr. Fox wrote a letter stating he had treated Davis in his clinic since June 2022 for her low back condition. (Tr. 961). Dr. Fox opined that Davis should avoid lifting floor to waist, could lift 0 pounds overhead frequently and up to 5 pounds occasionally; she could stand/walk for 2 hours and sit 6 hours in an 8-hour day, can sit for 30 minutes before changing positions, and may need to walk for 5 minutes after; needs to shift at will; and avoid when possible squatting, bending, twisting, reaching, climbing, and taking stairs; she had no environmental limitations and no limitations in her fine motor abilities. (*Id.*).

9

### D.    Administrative Hearing Evidence

Davis testified at a hearing before the ALJ on June 8, 2023, reporting that she had completed tenth grade and lived in an apartment with her adult son and her boyfriend. (Tr. 82-83). She was able to drive "a little bit" but relied on others to drive her or used medical transportation to attend appointments. (Tr. 83). She worked part time in lobby housekeeping, between 15 and 25 hours per week, until January 19, 2023, when she was let go because she could not perform the work. (Tr. 84-85). She was required to lift and move items up to 20 pounds. (Tr. 85).

In the past, Davis worked on production blanks, requiring her to pick materials off an assembly line and place them into boxes, and lift boxes weighing up to 75 pounds to place them on a pallet. (Tr. 86-87). She was let go from this job for missing too many days of work because of a back strain. (Tr. 87). Treatment included resting her back and attending chiropractic appointments. (Tr. 87-88). Davis also worked as a housekeeper in a nursing home and was required to lift up to 50 pounds in this position. (Tr. 88-89).

Davis testified that she was at a high risk for COVID-19 symptoms due to her autoimmune disease, which impacted her ability to work. (Tr. 93-94). She contracted COVID-19 in November 2020 and was symptomatic for a month. (Tr. 94). She received a doctor's note from Dr. Laszlo stating that she could return to work in August 2021. (*Id.*). Davis also worked in a part-time job for 32 hours per week over 4 days; she did not feel she could work a fifth day because of her back problems. (Tr. 94-95).

She had a slip and fall in 2021, exacerbating her low back symptoms. (Tr. 95-96). She attended physical therapy, received unsuccessful injection therapies, and was scheduled for an ablation the week following the hearing. (Tr. 96). Laying down or sitting in a recliner relieved

10

her pain, and at times, pain medication was helpful. (Tr. 96-97). Her doctors did not recommend surgery. (Tr. 97). She could lift a gallon of milk, could walk about ten minutes before resting, and could stand for about ten minutes before needing to sit down. (*Id.*). She could sit for about 15 or 20 minutes before needing to change positions. (Tr. 101-02). She was prescribed a cane. (Tr. 102).

Davis also had a connective tissue disease that affected her hands, joints, feet, and legs, with her left wrist bothering her the most. (Tr. 97-98). She had been wearing a brace on her left wrist for the past year and a half, as well as alternating ice and heat, with some relief. (Tr. 98).

Davis received medication management and counseling for her depression; symptoms included mood swings, irritability, and an inability to concentrate. (Tr. 98-99). She described her mental health treatment as "helpful." (Tr. 99).

The VE then testified. The VE identified Davis's past work as a cleaner, housekeeping, DOT 323.687-014, light, performed at medium, SVP 2; and hand packager, DOT 920.587-018, medium, performed at heavy, SVP 2. (Tr. 107-08).

The ALJ then presented the following hypothetical: an individual who can occasionally lift and/or carry, including pulling, up to twenty pounds, and ten pounds frequently; she can stand and/or walk with normal breaks for four hours in an eight-hour workday and sit for six hours in an eight-hour workday; she can occasionally climb ramps and/or stairs and never climb ladders, ropes, or scaffolds; she can frequently stoop and kneel; occasionally crouch and crawl; avoid exposure to dangerous moving machinery and unprotected heights; can carry out simple instructions and deal with changes in a routine work setting. (Tr. 108). The VE responded that this hypothetical individual could not perform Davis's past work. (*Id.*). However, the individual could perform work as a mail clerk, DOT 209.687-026, light, SVP 2, with 12,371 jobs in the

national economy; ticket seller, DOT 211.467-030, light, SVP 2, with 17,295 jobs in the national

economy; and marker, DOT 209.587-034, light, SVP 2, 136,788 jobs in the national economy.

(Tr. 109). The VE also noted that additional exemplars fitting the hypothetical would be

available at both light and sedentary unskilled levels. (*Id.*).

The ALJ then modified the first hypothetical to include sedentary jobs. (Tr. 109-10). The

VE identified available jobs as telephone quotation clerk, DOT 237.367-046, sedentary, SVP 2,

with 2,700 jobs in the national economy; call out operator, DOT 237.367-014, sedentary, SVP 2,

with 2,704 jobs in the national economy; and document preparer, DOT 249.587-018, sedentary,

SVP 2, with 15,661 jobs in the national economy. (Tr. 110).

The ALJ then asked if, added to hypotheticals one and two, if the VE's testimony would

change if the individual were limited to occasional interaction with coworkers and the general

public. (Tr. 110-11). The VE responded that the ticket seller, telephone quotation clerk, and

callout operator jobs would all be eliminated. (Tr. 111). However, other exemplars fitting the

hypothetical included the marker and mail clerk positions previously identified, as well as office

helper, 239.567-010, light, SVP 2, and with 11,218 jobs in the national economy; surveillance

system monitor, DOT 379.367-010, SVP 2, sedentary, with 2,774 jobs in the national economy;

and nut sorter, 521.687-086, sedentary, SVP 2, with 1,823 jobs available nationally. (Tr. 111-12).

The VE noted that she could identify additional sedentary jobs, but the national job statistics

would be at 2,000 available jobs or less. (Tr. 112).

In addition, the VE testified that all jobs, except for the ticket seller, would be available if

the individual were limited to frequent handling with the left upper extremity. (*Id.*). If the

individual were limited to lifting no more than five pounds occasionally, and change positions

from sitting to standing at will, including getting up and walking for approximately five minutes,

such accommodations would be work-preclusive. (Tr. 114-15). Likewise, it would be work-preclusive if a person needed to work in an isolated or solitary setting away from contact even from supervisors and coworkers. (Tr. 115). If the individual had trouble handling workplace stress more than 15% of the time, such behavior would be subject to disciplinary action and potential termination. (*Id.*).

The VE also testified that an individual can be off-task from 0-9%, but if they were off-task for 10% or more on a consistent basis, it would become work preclusive. (Tr. 112-13). Furthermore, if an individual required additional breaks or more than two absences per month, it would become work-preclusive after three months; one absence per month would become work-preclusive after six months. (Tr. 113). Little to no absences would be tolerated during a probationary period. (Tr. 115-16).

## IV.    The ALJ's Decision

1. The claimant meets the insured status requirements of the Social Security Act (the "Act") through September 30, 2027.

2. The claimant has not engaged in substantial gainful activity since July 7, 2021, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: obesity, degenerative disc disease of the lumbar spine with bulging, stenosis, spondylosis and facet arthrosis at the L4-5 joint, Raynaud's disease, undifferentiated connective tissue disease, history of autoimmune neutropenia, osteoarthritis, major depressive disorder and anxiety (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may stand and/or walk, with normal breaks, for up to four hours in an eight-hour workday; the claimant may frequently stoop and kneel, may occasionally crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant

must avoid exposure to unprotected heights and dangerous moving machinery; the claimant is able to carry out simple instructions, to deal with the changes in a routine work setting, and to interact on an occasional basis with co-workers and the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 3, 1974 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2021, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-25).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

14

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

B.      **Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.    Discussion

Davis brings one issue for review: Whether the ALJ violated 20 C.F.R. § 404.1520c when evaluating multiple medical sources. (ECF Doc. 7, p. 8). Davis clarifies in her brief that she takes issue with the ALJ's consideration of Dr. VanEstenberg's opinion (*id.* at pp. 9-12), Dr. Fox's opinion (*id.* at pp. 13-15), and also includes passing complaints of the ALJ's consideration of Mr. Balis's functional capacity evaluation (*id.* at p. 4).

The Commissioner asserts that substantial evidence supports the ALJ's consideration of both Dr. Fox and Dr. VanEstenberg's opinions, and provides a comprehensive review of the medical record in support of the ALJ's conclusions. (ECF Doc. 9, pp. 9-14). In the Commissioner's estimation, the ALJ met the regulatory standards for consideration of medical opinions: to explain their conclusions in terms of "supportability" and "consistency." (*Id.*).

For the following reasons, I agree with the Commissioner that the ALJ adequately

explained her consideration of the medical opinions at issue.

Before proceeding to Step Four of the sequential analysis laid out in the regulations, the

ALJ must determine a claimant's RFC after considering all the medical and other evidence in the

record. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work

despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011), citing 20

C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite

your limitations."). Relevant evidence includes a claimant's medical history, medical signs,

laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R.

§ 404.1529(a); *see also* SSR 96-8p.

With this, the ALJ must "articulate how [she] considered the medical opinions" and "how

persuasive [she] find(s) all of the medical opinions." 20 C.F.R § 404.1520c, *see Gamble v.*

*Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, *5 (N.D Ohio, Feb. 28, 2018). Factors to be

considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant,

including length of treatment relationship, frequency of examinations, purpose of the treatment

relationship, extent of the treatment relationship, and examining relationship; (4) Specialization;

and (5) other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are considered

the two "most important factors;" therefore, the regulations dictate that the ALJ "will explain"

how the supportability and consistency factors were considered. 20 C.F.R. § 404.1250c(b)(2).

Consistency concerns the degree to which the opinion reflects the same limitations

described in evidence from other sources, whereas supportability concerns the relevancy of

objective medical evidence and degree of explanation given by the medical source to support the

limitations assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2). According to social

security regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

### A.     Dr. VanEstenberg

Davis argues:

> The ALJ's evaluation does not comply with 20 C.F.R. § 404.1520c. The ALJ had an obligation to consider the mandatory factors of supportability and consistency and explained how each of those factors affected the overall persuasiveness of Dr. VanEstenberg's opinions. At best, the ALJ provided a cursor[]y declaration that her opinions were, at least marginally, consistent with and supported by the overall record.

(ECF Doc. 7, p. 10). She continues,

> Dr. VanEstenberg opined that Ms. Davis would need to engage in routine tasks in a more isolated setting. . . . This was not found to be inconsistent with or unsupported by the record. The ALJ did not claim that the opinion was to be rejected for any specific reason. Yet, Dr. VanEstenberg's opinion regarding tolerating work stress was omitted from the residual functional capacity. . . . The vocational witness testified that a need for a solitary setting would not allow for competitive employment. Therefore, had the ALJ properly addressed and considered Dr. VanEstenberg's opinions, Ms. Davis' residual functional capacity may have been different, and if so, it would have altered the entire outcome of this claim. Thus, the ALJ's failure to properly address or deal with this specific limitation significantly prejudiced Ms. Davis' disability claim.

(*Id.*, citing Tr. 115).

I disagree with Davis's assertion that the ALJ failed to properly address Dr. VanEstenberg's opinion that she would require to work in an isolated setting, or that the ALJ did not address the opinion in the context of supportability and consistency. In full, the ALJ considered Dr. VanEstenberg's opinion as follows:

> The consultative psychological examiner, Andrea VanEstenberg, Ph.D., indicated that the claimant would have some limitations in her ability to understand, remember, and carry out instructions, would have mild limitations in her ability to concentrate, persist and maintain pace, would have some limitation in her ability to interact with others and to adapt to the stressors of day-to-day work. Dr. VanEstenberg examined the claimant on a single occasion and was reporting within the bounds of her professional certifications and specialty. As this opinion indicates limitations in three of the four, psychologically based, work-related areas of function, it is at least marginally consistent with, and supported by, the overall evidence of record, discussed in digest form in the preceding paragraph. However, the opinion understates the claimant's limitations in maintaining concentration, persistence and pace, overstates the claimant's limitations in understanding, remembering and applying information, and, as to the specific degree of work-related limitation that would appertain, this opinion is vague and therefore less than helpful. In consequence, the opinion is not persuasive.

(Tr. 23). As the ALJ notes in her consideration of Dr. VanEstenberg's opinion, the prior paragraph includes additional information regarding Davis's social interactions and other mental health-related limitations:

> The claimant has described some difficulties getting along with others; however, her legal history is insignificant for violence towards others. She is involved in a romantic relationship of fourteen years' duration [hearing testimony], is discernibly able to function in public places, such as in stores, at a local park, on public transportation [hearing testimony], or while running household errands. She is generally described in the evidence in "pro-social" terms: with normal mood and behavior, as appropriate, pleasant, and cooperative, as appropriately interactive, or as pleasant. Provided the frequency of her interaction with others is controlled, the evidence shows she has retained sufficient, residual, social function to engage in competitive work. Isolated treatment notes have described poor insight and judgment; however, the claimant is typically assessed as exhibiting normal, or good, or unimpaired insight and judgment with the ability to make decisions with logic and insight. Provided she is asked to carry out only simple instructions, and to deal only with the changes typical of a routine work setting, the evidence shows she has retained sufficient, residual adaptive function to engage in competitive work.

(Tr. 23) (internal citations to the record omitted). The ALJ is not required to contain all findings into a single tidy paragraph. *Zaraa v. Comm'r of Soc. Sec.*, No. 5:20-CV-1854, 2021 WL 7286816, at *7 (N.D. Ohio Nov. 4, 2021), *report and recommendation adopted sub nom. Zaraa v. Comm'r of Soc. Sec.*, No. 5:20 CV 1854, 2022 WL 556737 (N.D. Ohio Feb. 24, 2022).

Therefore, "reading the ALJ's decision as a whole and with common sense" *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App's 674, 678-79 (7th Cir. 2010), it is clear to see that the ALJ did provide an "actual analysis" (ECF Doc. 7, p. 11) of Dr. VanEstenberg's opinion, and gave thorough consideration to Dr. VanEstenberg's assessment of Davis' social interaction capabilities.

I find no error on which to recommend remand.

**B.     Dr. Fox**

Next, Davis states that the ALJ's evaluation of Dr. Fox's opinion was "flawed" because her refusal " to view this opinion in the context of the record as a whole led to an inaccurate residual functional capacity." (ECF Doc. 7, pp. 13-14). In addition, Davis asserts that the ALJ's consideration of Dr. Fox's opinion was "insufficient" and that his assessment of needing a sit/stand option and other postural limitations was both supported by and consistent with other evidence in the record. (*Id.*).

However, my consideration is not confined to whether a medical source's opinion has support or is consistent with the record. *See Jones*, 336 F.3d at 476. Instead, I must affirm the Commissioner's decision if it is supported by substantial evidence, even if I would decide the matter differently, and even if Davis's position is also supported by substantial evidence. *Van Winkle v. Comm'r of Soc. Sec.*, 29 F. App'x 353, 356 (6th Cir. 2002).

Such is the case here. The ALJ considered Dr. Fox's opinion as follows:

The claimant's pain management provider, Kermit Fox, M.D., indicated, on January 18, 2023, that the claimant could stand and/or walk two of eight hours, sit six of eight hours, lift five pounds occasionally, could sit thirty minutes, then would need to stand and walk around for five minutes, would need to shift at will, should avoid squatting, bending, twisting, reaching, climbing and taking stairs when possible. He indicated she would have no manipulative or environmental limitations. Dr. Fox has treated the claimant, for six months at the time this opinion was rendered but had seen her on a single occasion, and provided an injection

without consultation or exam on another. He is reporting within the bounds of his professional certifications. However, by comparison to the overall evidence of record, described in digest form above, in the analysis of the opinions of Drs. McKee and Congbalay, this opinion overstates the claimant's exertional limitations. The postural limitations are too vague to be helpful in assessing the residual functional capacity, as even a champion tri-athlete may avoid these maneuvers when possible, as a matter of simple volition. He understates her environmental limitations. His opinion on her need to sit or stand, and to shift about is not consistent with the overall record, forms no part of the history of illness, and is not referenced in the sole clinical examination conducted before this opinion was rendered. This opinion is only minimally consistent with, or supported by, the overall evidence of record and is not persuasive.

(Tr. 12). Davis is within her right to be frustrated with the ALJ at the comparison between postural limitations and the ability of a "champion tri-athlete" to avoid such maneuvers. (*Compare id. with* ECF Doc. 7, p. 14). Nonetheless, the ALJ's insensitivity in her language does not change my analysis: she provides her assessment of Dr. Fox's opinion in accordance with the regulations and supported by substantial evidence. It is not for me to question more. I again find no reversible error.

### C.  Mr. Balis

With respect to Mr. Balis's opinion, Davis asserts:

Mr. Balis examined Ms. Davis and performed tests to specifically address her capacity to work. Mr. Balis explained that Ms. Davis would need to alternate between  sitting and standing . . . . [Therefore,] Dr. Fox's opinion regarding the sit/stand option was both supported and consistent with other evidence of record.

(ECF Doc. 7, p. 14). Davis states, "[m]ore importantly, the ALJ failed to recognize the most supportive piece of evidence . . . specifically done to assess Ms. Davis' ability to perform work-related activities." (ECF Doc. 10, p. 2).

Although it is true that the ALJ could have considered the evidence with respect to the supportability factor, the ALJ was not required to assess Mr. Balis's opinion of Davis's ability to perform work-related activity. According to the regulations, an ALJ is required to articulate their

consideration of medical opinions from acceptable medical sources. *See* 20 C.F.R. § 404.1520c.
An "acceptable medical source" is a medical source who meets a limited set of licenses,
including a licensed physician (medical or osteopathic doctor), licensed Advanced Practice
Registered Nurse or a Licensed Physician Assistant (both only for impairments with their scope
of practice). 20 C.F.R. § 404.1502(a). Because Mr. Balis's license as a physical therapist is not
included among the licenses in that section, he is not an "acceptable medical source" under the
regulations. *See id*. Where opinion evidence such as this is "inherently neither valuable nor
persuasive," the ALJ is not required to provide an analysis of their consideration of the evidence.
20 C.F.R. § 404.1520b(c).

I note, however, that despite Davis's contentions otherwise, the ALJ did indeed consider
Mr. Balis's opinion in the paragraph just prior to her consideration of Dr. Fox's opinion. (*See* Tr.
21). After providing an overview of Mr. Balis's opinion, the ALJ concludes that the evidence
was inconsistent and his opinion overstated Davis's limitations, and states "[t]he conclusory
statement that the claimant could only work part-time is among those opinions that are now, by
regulatory definition, neither valuable, nor persuasive. . . . this opinion is not consistent with, or
supported by, the overall evidence of record and is not persuasive." (*Id.*).

Therefore, Davis's argument that the ALJ did not consider Mr. Balis's opinion in the
context of its supportiveness to Dr. Fox's opinion is, itself, unpersuasive and erroneous. The ALJ
did more than was required under the regulations by providing her analysis of Mr. Balis's
opinion. There is no error here.

The throughline of Davis's argument appears simply to question the ALJ's results and
not her compliance with the regulations. Nevertheless, the Sixth Circuit has "rejected the
argument that an [RFC] determination cannot be supported by substantial evidence unless a

physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). The RFC determination "is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner." *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017). And an ALJ does not err simply because her RFC finding is based on a full review of the evidence instead of incorporating every recommendation contained within a physician's opinion. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base [his] RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." (internal quotation and marks omitted)).

It is not for this Court to question the ALJ's findings. Rather, it is only to determine whether substantial evidence supports the ALJ's findings, and whether the ALJ complied with the regulations. I find she has done both, and thus recommend the District Court affirm.

## VII. Recommendation

Because the administrative law judge applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Davis's application for disability insurance benefits be affirmed.

Dated: March 25, 2025

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).